Our next case is Michelle Baptist v. The Commissioner of Social Security, Appeal No. 22-2281. Mr. Richter. Thank you, Your Honors. And may it please the Court, My name is Matt Richter, on behalf of the Plaintiff Appellant, Michelle Baptist. The ALJ committed reversible error in this case by granting great weight to and wholly adopting the stale residual functional capacity assessed by the agency's reviewing physicians, who completed their assessments years before new objective imaging, which demonstrated significant new ideology in appellants' cervical spine in a complicated surgery as well to address brain aneurysm. Mr. Richter, does the Plaintiff contend that depression was a severe impairment here? I'm sorry, Your Honor, could you repeat that? Does the Plaintiff contend that her depression at various times was a severe impairment here? Yes, Your Honor, I believe her depression was a severe impairment, but I'm not sure it's... I didn't see that as part of the... I'm not sure it's relevant to the arguments. I don't think it is. Does she contend that her aneurysms are a severe impairment for her after the surgery? Yes. How so? She had complication after the surgery. Right, there was the visit to the emergency room a few weeks after the surgery, right? Right. How about beyond that? Do we have doctors finding restrictions on her functional capacity attributable to the aneurysms? I don't believe it's related specifically to the aneurysms, but when you have, again, not a doctor here, but when you have a neurological issue, like an aneurysm, as well as cervical spine problems, it's hard to really pinpoint where the... Well, that's what we're asking the ALJ to do, correct? Say that again, I'm sorry. That's what we ask the ALJ to do, correct? Yes. And so I'm trying to understand the extent to which your case depends upon evidence related to the aneurysms or whether we need to just focus in closely on the cervical spine issues. I think the most significant cause and the most significant issue is certainly the cervical spine imaging. Okay, and in particular the imaging done in the spring of 2018, correct? That's correct, Your Honor. So point us to the doctor's response to that imaging that you think shows the ALJ made an error here. I've looked at those doctors' reports, Ellison, Amin, and Graham, and I see conservative treatment, basically don't do anything different. So I think what really the thing that demonstrates this is significant etiology is the compromise. Etiology, is that the word you're using? Etiology, I'm sorry. Yes, that's correct. Is that E-T as opposed to I-D-E-O? Yes. Thank you. I think the underlying basis of the impairments that you can see demonstrated on the 2018 MRI is the compromise of the cervical spine itself, the ventral aspect of the cervical spine. And the doctor's interpretation of the MRI, then diagnosing radiculopathy, which is, by definition, it's an indication that there is some compression of the spine or a nerve root somewhere. There is abutment, right? Yes, abutment. Okay, not compression. And where do we see the doctor saying, in essence, this explains her situation or this imposes restrictions that effectively render her disabled? Well, that explicitly is not there, Your Honor. And I think that speaks to the point of the case. That's why we need an expert to look at it. Did you meet with the surgeon on May 8th, the neurosurgeon, Dr. Amen? They've characterized the degree of degenerative disc disease. They're not speaking to medical corroboration of the alleged limitations caused by the contact to the cervical spine. So you're agreeing that Dr. Amen, the neurosurgeon, her treating neurosurgeon, reviewed the MRI? Yes. And the neurosurgeon did not find any additional, did a full examination, reviewed it? Didn't opine upon physical limitations. And that's not distinct from any of the case law that's cited here. In Gowans, we don't have an opinion from a doctor that says the cervical spine compression is causing her to not be able to lift and carry something. That's the problem with these cases is that no doctor is giving an opinion as far as medical corroboration of the allegations of physical limitations made by the Social Security claimant. So when you look at a case like Gowans, you have a new finding, and you don't necessarily have the doctor who interprets the MRI and puts it in a report saying, well, these are the physical limitations that would reasonably result. But here you do have a neurosurgeon, her neurosurgeon, that reviews the MRIs and says, we're going to continue conservative treatment. OK. Yes. But I don't think there's a standard as far as what the doctor thinks about the significance of the MRI based upon whether, we shouldn't have a standard where the doctor has to say, well, you need surgery, or there's no worsening of the ideology demonstrated in the MRI. Just continuing with conservative treatment isn't necessarily an indicator that there hasn't been a worsening to this finding. Does it matter here, Mr. Richter, that the claimant has the burden of proof? Your Honor, and I'll cite to a previous decision made by this court, it is a non-presidential disposition. That's not very helpful. Well, Your Honor, I would let you know that you are correct. Could you address the burden of proof? The burden of proof on the plaintiff is to produce evidence, not necessarily medical opinions. And that's a direct quote from the Kemplin case, citing the Scott case, which is a presidential case. And Your Honor, you actually were on the panel that issued that decision, Kemplin. And Kemplin was the non-presidential case you're referring to? Yes, but it does cite to Scott. And what's Scott? That quote in Kemplin, I believe, is what was taken from Scott. And that quote is, again, can you give that to us again? That the claimant's burden is to produce evidence, not necessarily opinions. Mr. Richter, would you like to save the rest of your time for the final? Yes, I would, Your Honor. Thank you. Mr. Budd? May it please the Court, Stephen Budd on behalf of the Acting Commissioner. The ALJ recently weighed the evidence in this case. She acknowledged that Ms. Baptist had a severe cervical impairment and accommodated her with significant work restrictions. However, Ms. Baptist's own doctors consistently interpret the imaging studies in this case as showing only mild or minor findings, and they consistently recommend only conservative treatment. Ms. Baptist's initial x-rays, cervical spine MRI, and EMG showed findings that multiple doctors interpreted as mild or minor. Doctors recommended only conservative treatment with medication, and Ms. Baptist declined recommendations for steroid injections. On this record, the state agency reviewed and concluded that Baptist retained residual functional capacity for light work. The record after the state agency review remains consistent with the record prior to their review. While Ms. Baptist had another EMG in 2017 and a cervical MRI in 2018, the doctors who administered these tests interpreted them as continuing to show only mild abnormalities. Baptist was then referred to two specialists, a neurosurgeon, Dr. Amen, and a physiatrist, Dr. Graham. Dr. Amen interpreted the EMG and MRI as showing only mild findings with no severe spinal narrowing. Dr. Graham found that the studies showed only minimal spinal narrowing with no red flag signs. Both doctors continued to recommend only continued conservative treatment with the same medications, and Ms. Baptist continued to decline recommendations for injections. Put simply, it was Ms. Baptist's own doctors, not the ALJ, who interpreted these imaging studies. The ALJ appropriately relied on Ms. Baptist's doctor's statements. She also correctly noted that Ms. Baptist's doctors continued to recommend only medication injections, and Ms. Baptist continued to decline injections. With similar facts, this court recently held in Durham that an ALJ is allowed to rely on the assessments of the claimant's own doctors regarding medical studies, especially when there is no significant change in treatment following those studies. Similarly, in Ducharme, the court has recognized that an ALJ does not need another medical opinion if the ALJ relies on the interpretations of the claimant's own doctors. The assessments of neurosurgeon Amen and physiatrist Graham support the ALJ's findings about these updated imaging studies, and the ALJ is not obligated to seek another opinion. What do we do with the plaintiff's argument, though, that, in essence, they weren't trying to address functional capacity and impairments? Well, for starters, it is the ALJ's job to assess functional capacity, and this court has held that in the ALJ. Yeah, yeah, yeah, but they have to do it on the basis of evidence, and there seems to be a step missing here. Well, the ALJ relied on the state agency reviewers who opined that she could perform better. Yeah, that was years earlier, though, right? But I think the salient point is that the record before their review and the record after review are essentially identical. In terms of the spinal imagery? In terms of the doctor's interpretation of those images, before their review, the doctors have EMGs and MRIs, and they interpret bottom line, interpret those studies as showing mild findings. After the state agency review, the doctors have another EMG, another MRI, and they arrive at the same conclusion. So the record before the state agency review and after the state agency review is similar with respect to how Ms. Baptist's doctors assess these studies and treat her impairments conservatively with only medication. Can I ask you a quick question? Why doesn't Ms. Wongard count as a treating source here? Ms. Wongard is a nurse practitioner, and under agency policy at the time of the decision, nurse practitioners are not acceptable medical sources, and only acceptable medical sources can qualify. But today they would be? Today she would be, but today the regulations have changed, and the agency no longer has a treating source role. Right, right. So let me just ask you, what does it mean to say the ALJ played doctor other than that the commissioner loses when the court applies that label? What does it look like? Well, I think there's a distinction between cases such as Durham and Ducharme, where an ALJ relies on the claimant's physician's interpretations of the imaging studies, versus a case like in Goines, where the imaging study revealed a whole new impairment. It revealed a possible source of the claimant's complaints of headaches. In McHenry, the ALJ compared the MRI findings herself to the earlier MRI findings. The ALJ didn't do that here. He just relied on the claimant's doctor's assessments, which remained consistent throughout the period. And in Aiken, the third case, plaintiff's sites, the state agency doctors didn't review imaging studies at all. There were no MRIs before them. So the ALJ concluded that updated studies continued to show mild findings, but there was no support for that conclusion in that case. I mean, I think it's a case-by-case inquiry. But the salient point, too, is that this court has recognized repeatedly that it's within the ALJ's discretion whether an updated medical opinion is necessary. Can we talk just for a minute about Aiken v. Berryhill? Yes. And in that case, the ALJ erred in discrediting the plaintiff for receiving conservative treatment or conservative course of treatment. And the ALJ here considers the conservative course of treatment a key factor in assessing the severity of Ms. Baptist's conditions. How is this case, I guess, distinguishable from Aiken? Well, in this case, the claimant's own doctors described her treatment as conservative. Her only treatment is medication. She declined injection treatments. The doctors, after the new imaging studies, recommend continued conservative treatment, and the ALJ properly is relying on their assessments for treatment. This court has recognized ALJs can consider conservative treatment. This court has held that medication and injections is conservative treatment. ALJs are allowed to consider that. I think an ache in the error was that the ALJ was assessing the significance of imaging studies that were not reviewed by doctors. But in this case, the ALJ is relying on the doctor's assessment of those studies. Regarding aneurysms, briefly, the ALJ didn't just rely on the state agency. The ALJ considered the evidence, including the claimant's January 26 surgery and her hospitalization shortly after that surgery. But the ALJ noted only six weeks after surgery, back to its own doctors, released her for full activities with no restrictions. And the ALJ still credited a 20-pound lifting restriction that her pre-surgery doctor recommended as a precautionary measure. Regarding the opinions, Dr. Allison admitted that his opinion simply recanted Ms. Baptist's subjective complaints. He suggested that she might be malingering because she exaggerated her inconsistent effort during strength, grip, and range-of-motion testing. Wasn't that just a couple of months before the brain surgery? I believe so. But this was what Dr. Allison said was the basis for his opinion was simply Ms. Baptist's own complaints. And this court has held in the Britt decision that an ALJ may reject the doctor's opinion entirely when it's only based on the claimant's subjective complaints. I understand the point. But when that patient needs brain surgery two months later, I'm not sure that rationale extends that far. Well, I think the record in this case shows that Ms. Baptist's initial neurologist, I think it's Dr. Siddiqui, recommended just monitoring her aneurysms with not doing any surgery at the moment. Subsequently, she had an updated second opinion, I guess, from Dr. Amon, and he offered her the option of surgery, which she decided to go with around November 2015, I think when she saw him for the first time. And Dr. Amon is actually the same doctor who interprets the immediate studies later. But the record shows that Baptist's aneurysms, within six weeks of surgery, she was cleared to return to full activities. There's no subsequent evidence of any complications or surgeries or further treatment besides annual exams. So I think the record supports the ALJ's conclusion that this is a non-severe impairment, and there's really no contrary evidence that this limited her shortly after surgery. Just to conclude, the Supreme Court has observed that the substantial evidence bar is not high. The commissioner respectfully submits that the decision meets that bar here. And if there are no further questions, the commissioner asks that the court affirm the decision. Thank you, Mr. Budde. Mr. Rector. Thank you, Your Honor. Just briefly, as it relates to conservative treatment and abutment of the ventral cervical cord, I want to make the point here that what Ms. Baptist needed to prove was not that she was bed-bound or even close to that. Because of her age, all she needed to prove was that she couldn't be on her feet for six hours a day and she couldn't lift and carry up to 20 pounds for just over two and a half hours per day. So when we're talking about abutment of the spinal cord and things like conservative treatment, I don't believe that those things or the conservative treatment would speak to whether there's medical corroboration or the difference between the ability to stand and walk for six hours and the ability to stand and walk for only five. I think, and I think the reason the court has been so consistent in the past about saying, why not let a doctor look at this is because it takes expertise to determine whether abutment of the spinal cord medically corroborates an inability to... Mr. Richter, under your test, wouldn't every time a plaintiff or a claimant went to a new doctor and got a new report, we'd have to, I mean, this process would never end. You're right, Your Honor. It would never end under your test. You're correct, but that is not my test. My test is... Because here the ALJ looks at the reports and she says, this is what they say and basically this is kind of easy. I'm not interpreting anything. I'm just reading the results from the MRI and there's no difference here. There's no material difference. That's it. I have a hard time accepting the notion that an MRI that doesn't show a disc contacting the spinal cord and then a subsequent MRI that does show a disc at least touching the spinal cord are not two medically different items. And we're having this debate here over it, but none of us are really qualified to answer that question in my view. And, you know, what the court has concluded in the past is that where it's potentially outcome determinative, where the new evidence is potentially outcome determinative, a doctor should look at it. And in this case, there's no question that the new MRI could reasonably be interpreted to keep appellant from standing and walking six hours of eight hours every single day. So I just think that on that basis, reversal and remand is required. Could I quickly ask you, if I may, did you adjust your claimed onset date here? I didn't represent Ms. Baptist at hearing. What are you asserting as the onset date here? Well, until you would go back before Social Security, it would have remained what it was. But she could be found, her onset date could be found any time between the alleged onset date and her date last insured, which is the end of last year. Well, what I'm getting at is if we were to agree that somebody needs to look, that a doctor needs to look at the new MRI, that would not go back anywhere near the time that she applied for benefits. No, it would likely go back at the earliest to the new cervical spine MRI, in my opinion, as a Social Security practitioner. Thank you. Thank you, Your Honors. Okay, thank you, Counsel. The case will be taken under advisement.